Good morning, Your Honors. May it please the Court, my name is Rene Voss for Appellant Conservation Congress. I'd like to reserve five minutes for rebuttal. Just watch the clock. Thank you. This is an Endangered Species Act and a NEPA case, and the key question this case presents is, will the extent of this short-term degradation of the spotted owl, the threatened species, habitat, and its prey be so harmful that it will displace and eliminate the owl from the project area before they are able to enjoy the asserted life of the owl? Will there be long-term benefits of the projects, which may be decades from now? Neither the Forest Service nor the Fish and Wildlife Service have provided the necessary analysis to answer this key question. Appropriately framed, Appellant's argument is that the new studies and the new spotted owl recovery plan constitute, quote, new information that reveals effects of the actions that may affect listed species in a manner or to an extent not previously considered. The canons of construction requires that the word extent in this regulation be given independent meaning from manner, which necessarily requires some discussion about the quantitative nature of the extent of the effects. In other words, extent in the regulation would simply be duplicative of the word manner, and the resulting analysis would be largely useless to the decision-makers and the public because it will describe only the nature of the effects and how they will take place, their manner, but not what they will be, their extent, meaning their scope or how long they will last or affect the owl essentially in the short term, which can last for decades. Why do you think the 2009 biological assessment contains sufficient analysis? Because the 2009 biological assessment never addressed the new information from the recovery plan and the studies. It preceded the 2011 recovery plan. And in that recovery plan, there were a series of studies that were presented that were never presented before that talked about the short-term adverse effects from specifically thinning, the same thing they're doing in this project on the owl and more importantly, the owl's prey on the spotted owl. And so these were never considered either in an ESA or in a NEPA context. And so it simply wasn't addressed then, and that's really the crux of this case. Well, all the way through, it's not as though the agencies ignored this issue. I mean, they've been focused on the short-term effects of the thinning on both the owl and its prey. During the whole course of this project, right? Well, the project essentially is not designed to protect the owl. The purpose of the project is to reduce fire risk and make communities nearby safe, which are actually miles from here. So that's not the purpose of this project. As to the fire aspect, though, it certainly would protect the owl in some respect by reducing fire risk, because if the fire takes out the upper canopy, then the nesting grounds are gone, right? Yes, and that's one of the long-term benefits of the project that could be revealed in the short-term. Even the fuel reduction is not going to help. It's simply going to degrade the habitat for the owls, which they avoid. They avoid these thinned areas, and it sets back their prey base for decades, in some cases up to 50 years. And so the owls, who only have a limited lifespan between 10 to 20 years, may be gone before they can reap the benefits from the thinning. That may produce good habitat in the long term. So really it's the short-term effects that have not been analyzed based on this new information, either the ESA or the National Environmental Policy Act. So the agencies have only considered the long-term benefits from the project, but have failed to analyze the admitted short-term harms. I mean, they admit that they have short-term harms that can last for decades. They don't analyze what the extent of these harms will be, which is required according to the regulations when new information arises. With regard to NEPA, the district court order is clouded by a clear error of fact, and this court must address that clear error because the court believed that the agencies actually analyzed the new recovery plan and the underlying studies in their environmental impact statement. But those both preceded, all those things preceded, I'm sorry, the analysis preceded this new information. So the court is incorrect that it could have been analyzed as part of the NEPA process. But those are two separate issues. What specific error of fact are you suggesting was in the NEPA study? It's not the error of fact in the NEPA study. It's the error of fact in the judgment by the court. The court said that it's clear from the record that the Forest Service would have analyzed the 2011 recovery plan and its underlying studies when that, those studies did not exist until after the NEPA process was completed. So the court made a clear error in deciding that they could have obviously analyzed those as part of NEPA. Under NEPA, the Forest Service never explicitly discloses the actual adverse effects from logging on the owl's prey or burning, which they do after the logging is done. And the analysis is basically limited to counting acres, whereas NEPA requires a quantitative analysis, a rigorous hard look at these effects. They basically say that there's short-term adverse effects. They admit that. But they don't go to the next point and say what are the results of these effects on the owl's prey or the habitat. Is it actually going to potentially cause the owl to avoid these areas for decades is what the study says, and therefore make that habitat completely unsuitable? And these areas are already below thresholds for reproductive success. The baseline of this project is that all 13 of the territories where the owls are currently residing are below these reproductive thresholds as admitted by appellees. And they can just barely survive, let alone reproduce, is what this threshold is all about. If they can't reproduce and their foraging habitat continues to be degraded, then it's going to be wiped out before they can reap the long-term benefits from the project. I just wanted to say, address the issue of mootness since it's been raised. Certainly the NEPA claim is not new moot because there's no debate about that. The motion dismissed is based only on the ESA claim. And so the mootness arguments by appellees tries to say that the new biological opinion has essentially taken care of all the old consultation issues over the short-term extent of the effects on the owls, the barred owl invasion, which is competing with the owl and isn't present in the project area, and these new scientific studies. But a close look at this new biological opinion and the biological assessment, which are attached to the mootness briefs, show that they really did not address these issues in either analysis. They don't even mention the barred owl as far as the Fish and Wildlife Service goes. And they simply point back to the original consultation documents, which didn't have anything or any analysis based on the issues that were raised in the district court or on the merits under the Endangered Species Act claims. And so the cases cited by appellees are distinguishable. All cases they cited, there are four cases by the Ninth Circuit, all the biological opinions that were issued later on completely overrid the issues that were previously addressed on the merits. However, in our case, none of those issues really were addressed. And so those issues remain live, and the Court can still provide effective relief on these claims by asking. I take it you're also relying on Conservation Congress versus the Forest Service, our 2013 decision? We are, but I actually, and I apologize to both opposing counsel and the Court, that during oral argument I found some additional cases that we should have been relying on, and there's a Ninth Circuit opinion, and I'd be happy to provide the citations. Before you leave the courtroom, check with the deputy clerk and get copies of the gum sheets that you'll serve on the three judges as well as your opposing counsel. Yes, Your Honor. If you want us to take them into consideration. Yes. The first Ninth Circuit case in Greenpeace Action v. Franklin from 1992 actually held that it said a case was not moved if the biological opinion never addressed the issues that were raised in the case. But there were two district court decisions that squarely addressed this issue that are very similar. The one that's directly on point, and these are also Greenpeace cases. They happen to be all Greenpeace cases. One's Greenpeace Foundation v. Mineta and Greenpeace v. National Marine Fisheries Service. And what do these cases hold? Okay. The Mineta case, the facts are most similar to this case. In this case, the agency prepared a biological opinion to assess the impacts of fisheries activities on the food of the monk seal, which is an endangered species out in the Hawaiian Islands. The court found that the record documented the agency's steadfast resistance to reevaluating the fisheries activities on the impact of the monk seals, similar to our case in which the agency does not want to go back and deal with these the extent of the short-term harms on the spotted owls and its prey. The court stated that the more recent consultation in their biological opinion simply reiterated the same conclusions stated in the previous consultations and held that the agency's speculation about the endangered species jeopardy on that basis was arbitrary and capricious. So it said the case was not moot and that it could address the issues that are underlying. And it's the same thing here in the biological opinions. They rely on the previous consultations, both the biological assessment and the new biological opinions, points back to the original consultation, which is that issue in this Court, and it does not provide any kind of a new analysis on those issues. And so that case squarely is identical to our case in how that it was not moot on those original issues, even though a later biological opinion was issued. Kennedy, you're down to five and a half minutes. You may wish to reserve or your choice. I'll reserve. Thank you. Thank you. We'll hear from the other side. Thank you, Your Honor. May it please the Court, I'm Mark Haig from the Department of Justice. With me at counsel table are Veronica Rowan from the Department of Interior, James Rosen from the Department of Agriculture, and counsel for interveners, Scott Horngren. I'm going to divide my time with him. I'll take 15 minutes, and Mr. Horngren will take five. Very well. I'm not sure where to begin. I guess I would start with the general point that cataclysmic fire is a threat to the communities of Northern California, and it's also a threat to the owl. And this project is designed to address that threat by reducing the risk of catastrophic fire, and it's designed in a way to protect the owl and its habitat and its prey, both in the short term and in the long term. And I guess this short-term, long-term distinction is an important one. The environmental impact statement, the biological assessment, the supplemental EIS, the amendments to the BIOP, the informal consultations address the fact that habitat will be degraded as a result of this project. But there's a distinction between degrading habitat and removing habitat. And the Forest Service found, and the Fish and Wildlife Service concurred in the finding, that in the short term, there will be not—the project is not likely to adversely affect the owl. And in the biological opinion, that was completed just recently. The agency—the Fish and Wildlife Service also found that the project is not going to adversely modify critical habitat. And those findings are not based on some kind of a balancing between short-term impacts and long-term benefits. It's a finding that in the short term, there's not likely to be take of owls as a result of this project. The biological assessment and the EIS say the project is not likely to cause any of these owls to abandon their current activity areas. So the short-term effects are minor. They're insignificant for purposes of NEPA. They're insignificant for purposes of the ESA. And then the long-term effects are beneficial to the owl. So the question is whether—or one of the questions is whether or not the agency has adequately considered the new information, the Forsman study and so forth. How do you respond to that? The record demonstrates that they did, Your Honor. The original project is designed to be consistent with the 2008 recovery plan, which addresses these issues of habitat quality and maintaining adequate nesting roosting habitat, maintaining adequate foraging habitat. The studies that Forsman—the Forsman study is 2011, and it's more—it postdates that original—the 2008 recovery plan. There were a number of studies that predated the 2009 biological opinion and then Forsman, which is later. Right. But Forsman—the studies that Forsman relies on and the data that Forsman relies on predate the 2008 plan. And those concerns are reflected in the 2008 plan. But in any event, when the revised recovery plan was in draft—and I should get my—make sure I have the timing right on this—the agencies consulted, and there's a technical assistance letter from the Fish and Wildlife Service from 2011 that looks at the issue of whether the new recovery plan changed the analysis. The new recovery plan reflects Forsman. It reflects Dugan. And the Fish and Wildlife Service determined in that technical assistance letter that the project was consistent with the 2011 recovery plan. So all of those issues have been addressed. And as the project has moved forward and new information has arisen, the Forest Service and the Fish and Wildlife Service have consulted informally and looked at whether any of that new information changed the analysis, and they have concluded, and it's documented in the record, that it doesn't change the analysis. My question, Mr. Hogg, relates to the Bardows, and there seems to be some dispute between the parties on this point. But if I read under your NEPA claim, if I read what the Forest Service concluded, they said, well, these owls aren't currently in the area, so therefore, there's not much to discuss, I guess. My question is, does that really take into account whether the habitat is such that they're going to return? In fact, they were there as recent as 2009. So my concern is whether or not there needs to be further discussion, because that seems to be a fairly tangible factor in which there's a disagreement between the two sides. I think the key issue, there's a debate between the Forest Service and the Conservation Congress about whether the owls are present. So let's just take your position, which is they're not currently present. Well, it's right. And it's not that they haven't. There's a distinction between resident and passing through. But the key point is, whether they're present or not, the measures that the agency is taking here would be the same. The agency's design of the project is consistent with the assumption that owls are present, because the recovery, the 2008 recovery plan, the 2011 recovery plan, all are. Presume both the spotted owl and the barred owl are present? Or which? Presume that the barred owl is present. And the only way to recover, conserve the spotted owl is by maintaining high-quality habitat. And that's what this project does. So the project is consistent with the assumption that the barred owl is present. Nobody knows what else to do except for there had been a proposal for lethal take of barred owls, to shoot the barred owls or trap them to protect the spotted owl. But beyond that, there's nothing to do. Okay. So I take it your position is that everywhere you've made a statement and explanation, it's in effect presumed that the barred owl is present? Because as I read part of the statements, it was that, well, they're not currently present, therefore kind of end of story and don't need to explain kind of downstream habitat issues or whether the current habitat would encourage them to return. So I'm not completely sure I understand how they're covered in the Forest Service's evaluation. The idea of the owls returning or not, I don't think that barred owls were historically indigenous to this region. The concern is that they are spreading into areas of the spotted owl. There have been a couple of reports of presence. I was going to say sightings, but it's usually not sightings. It's hearings of detections of barred owls in this area. The most recent studies by the Forest Service did not detect any barred owls present. And the most recent studies found that spotted owls had become active in the area where the barred owls had previously been detected, which suggests that the barred owls are not resident because spotted owls won't nest or breed where barred owls are present. But the larger biological issue, how do you conserve the spotted owl, is the answer to that in the recovery plan is by preserving habitat and promoting or restoring the development of future high-quality habitat. So, therefore, if they're there, meaning the spotted owls are there, the barred owls won't be there. The barred owls are unlikely to be there. Unlikely to be there if the spotted owl has appropriate habitat in which to thrive. Well, it's a little more narrow than that. In these specific activity centers on the project area, I think before 2008 or 2009, there were no spotted owls identified in the surveys. More recently, spotted owls have been identified there. And so the thinking is the spotted owls would not have returned to those activity centers if barred owls were present. I understand. I don't think that that – so it's specific to the project area. I would like to take a few moments to address the issue of the extra record declarations, which is part of the ESA claim here. As we argue in our brief, we think it was error for the district court to admit the extra record declarations, particularly of Mr. Della Sala. The district court relied on Cray and Brink. But to the extent that Cray and Brink says that the APA record review limits don't apply, that is – that would be inconsistent with this Court's en banc decision in Carrick Tribe. And we cite that in our brief. And I have an additional citation. Is there some tension between those cases? Is there some tension between those cases as you read them? Between Cray and Brink and Carrick Tribe? Yes, I think there is, Your Honor. I think Cray and Brink – the only way that Cray and Brink makes sense is to assume that the intent was to admit the extra record declarations under one of the recognized exceptions to the APA record review rule. Well, maybe the answer is the ESA is not necessarily subject to the APA. Is that – I think that's incorrect, Your Honor. Carrick Tribe and many other decisions of this Court are quite clear that the standard of review in an ESA case is the APA standard of review. Conservation Congress argues that there's – in its reply brief that there's a distinction between the standard of review and the scope of review, and that while the standard of review is arbitrary and capricious, the scope of review is not limited to the record on appeal. But Carrick Tribe says no, that an APA ESA case is a record review case. And this Court's decision more recently in San Luis and Delta-Mendota Water Authority, which is from March, and that's at 747 F. 3rd 581, that case talks about the importance of the record review principle in the context of an ESA case, and it points out the pitfalls of allowing what should be a record review case to turn into essentially a trial de novo with competing experts. Right. But I think, you know, Carrick didn't really reach the question of scope of review, did it? I mean, you have the cases that distinguish between scope of review and standard of review, and Carrick didn't go so far as to say that scope of review was subject to the same rules. Well, what Carrick does, I mean, it's not a major issue in the case. Right. That's correct. But the Court does... I think there's only one sentence. But it's a really good sentence. Because this is a record review case, we may direct summary judgment, and then the next paragraph, an agency's compliance with the ESA is reviewed under the Administrative Procedure Act. There's a long line of cases that hold that APA, the APA's record review provision or review under the APA is record review. The two things are intertwined. You can't distinguish between the scope of review and the standard of review in the manner that Conservation Congress does. You know, I'm sorry, Counsel. You have a very co or very anxious co-counsel. You have a very anxious co-counsel. You may wish to allow him to speak, unless you have something further to say. It's your... Unless there are no questions, I'll sit down. Thank you. No. No further questions. Thank you. Thank you, Your Honor. Scott Horngren on behalf of the Intervenor Trinity River Lumber Company. A few key points as you sort through the facts of this case that I'd like you to keep in mind. And first is the Forest Service was extremely conservative here in designing this project. Only 16 percent of the 24 million acres under the Northwest Forest Plan, which covers this area, is so-called matrix. And this is the area where timber harvest should... where timber should be produced. And, in fact, that's one of the purposes of the project here. There is no harvest in the late successional reserves. It's all matrix. But in an extremely conservative approach, the Forest Service designed harvest to maintain 60 percent of the canopy, which makes these sales in some ways barely commercial because there's not enough volume to justify the thinning. They also had planned to do what they call regeneration harvest, which is more akin to clear-cutting. And Supplemental Excerpts of Record 439 shows that they, in their final decision, decided not to do that. And then they designed the project assuming that all owl activity centers were below the threshold, as counsel had pointed out before. But unlike most projects dealing with owl habitat, the Forest Service didn't take credit for the amount of foraging habitat currently there. It explains in the record that had they done so, there would be plenty of habitat both before and after the harvest. And then, finally, there's imposed in this project a seasonal operating restriction if there's active owls during the nesting season. And that's quite a breadth of restrictions, or quite a long period of restrictions, from February 1st to September 15th. Second, we think as you write your opinion here, it's important to clarify agency obligations in ESA Consultation Section 7. The first, the contents of a Forest Service biological assessment, which plaintiffs are complaining about the adequacy of that biological assessment, those contents are discretionary per the Consultation Regulations 50 CFR 40212. And I think it's important because consultation on fish, grizzly bears, whatever, to really clarify that in this opinion. And second, that you cannot engraft formal consultation requirements on informal consultation. And in this particular case, it was informal consultation, and we think that distinction is important. And then we would also urge the Court to recognize that the 2001 Spotted Owl Recovery Plan, which touches on a number of these issues here, is not a plan that establishes owl reserves in an approach that's off-limit to forest management. Rather, this plan, uniquely, and we in the timber industry were told by the Fish and Wildlife Service, you know, get behind this plan because what's good for a healthy forest is good for the owl. And the plan, in fact, encourages active forest management to maintain, accelerate development of, and restore spotted owl habitat. On these issues of Forsman and Duggar, we'd urge the Court to go back and look at Ecology Center versus Castaneda, where you're looking at these publications that come out afterwards. And the issue there, and the Court held that a general study that doesn't directly challenge agency conclusions in the project does not have to be considered by the agency. And we would argue that both the Duggar Barred Owl Study and the Forsman Quality Habitat Study are general studies that don't single out the Forest Service of this project saying that there's a problem. And on the barred owl, Duggar recommended retention of unfragmented late-successional old growth, which is exactly what the Forest Service does here. Regardless of the survey issue, the actual design of the project does not fragment any complex old-growth forest, and I see I'm out of time, and we would urge the Court to affirm the District Court. Thank you, Counsel. There is some rebuttal time for you, Counsel. Mr. Vos. Thank you, Your Honor. I wanted to address the barred owl issue since it just came up. The barred owls must be assumed to be there. The recovery plan specifically says, and I quote, barred owls now occur at some level in all areas used now in the past by spotted owls. And just because the Forest Service didn't go back and out and do surveys to find them, which they only do regularly and only in certain areas, doesn't mean they're not there. But they have been found. They've found well over 20 different barred owls over the time in this area and must be assumed to be there. Now, the issue with the barred owl is actually quite complex, and you have to understand how the thinning and the logging will affect both the spotted owl by degrading their habitat and their prey and how it will make the project area more beneficial for the habitat for the barred owl. They actually, the barred owl uses exactly the same habitat the spotted owl uses. So just simply preserving the old growth in the high core areas doesn't really do enough to prevent the barred owl from coming in. But by degrading the habitat for the spotted owl, the spotted owls will avoid those degraded areas, the thinned areas, and that's what the science says, the Forsman studies and the Thugger study and the recovery plan says that they will avoid these areas because they don't like the way the habitat is and they will not go in there because there's no prey available for them because it's set back for decades in some cases. However, the barred owl, it's a little bit more generalist. It has more prey species that it can, it eats the same prey as the spotted owl. And so it can survive in these degraded areas. And so since they're competitors and they interact, if the spotted owl is not there, the barred owl can move in and take over these areas where they can survive better than the spotted owl. Their territories are larger, they cover more area, and so you get this competition between the two species. And this is all spelled out in the briefs. I'm not bringing up anything new. Well, are you relying on the Forsman study for this interpretation that you're making now? The Forsman study and the Thugger study discuss these interactions about the barred owl. Okay, but on judicial review, our standard of review has to involve a certain amount of deference. Does it not in this context or not? It doesn't because this never was, none of these issues were addressed in the NEPA analysis or the Fish and Wildlife Services analysis. They simply make these blanket conclusions about there being no problem when they haven't really addressed this through the analysis. I suppose they have the obligation under the Endangered Species Act to study the extent of the effects and the manner of the effects. They haven't even discussed the manner of the effects in the consultation. There's nothing in the record of any discussion about these issues about the barred owls. There's not even a mention of the barred owl competition with the owl under the NEPA analysis. And they never went back and readdressed these issues. All these new studies, the Forsman and Thugger studies, even though some of the studies underlying these and what's in the recovery plan existed prior to the 2008 recovery plan, they are not in there. And they were never addressed, according to the record, in the NEPA analysis or in the biological assessment. None of these studies are ever mentioned in there. The Forsman study and the Thugger study is not mentioned. All the thing studies, there's like a dozen of them in the recovery plan. They're not mentioned anywhere in the biological assessment. Just quickly, since my time is running out. Yes, Judge Chalmers, you're correct. The scope of review was never addressed in the cart crab. And that's not an issue, really, that the Court should worry about. The one thing I wanted to just make sure the Court understands is that the degradation of habitat is essentially the same as removing habitat in this context, because the owl will avoid these areas. The spotted owls will avoid this area. So there can really be no distinction between removing habitat and degrading habitat in this context, especially here in this project area where it's already below thresholds. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision, and the Court will adjourn.
judges: O'scannlain, Thomas, McKeown